# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

EDWIN OVEH,

    Plaintiff,

v.

DAL GLOBAL SERVICES, INC.,
*previously named as Delta Airlines Global Services, LLC*,

    Defendant.

Case No. 15-cv-94-JED-PJC

## **OPINION AND ORDER**

This is a pro se employment discrimination action in which Plaintiff Edwin Oveh ("Plaintiff") alleges discrimination on the basis of race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. Defendant DAL Global Services, Inc. ("DGS") filed a Motion for Summary Judgment (Doc. 18) and Brief in Support (Doc. 19) on October 21, 2015. On November 9, 2015, Plaintiff filed a "Response in Opposition" (Doc. 20) in which he made a request under Fed. R. Civ. P. 56(d) that the Court either deny DGS's Motion for Summary Judgment or defer considering it "until parties have resolved all discovery issues including material facts still disputed." (Doc. 20 at 1).[1] Notably, the discovery cut-off date in this case was August 28, 2015.

DGS responded to Plaintiff's Rule 56(d) request in its Reply (Doc. 21). Subsequently, Plaintiff filed a Sur-reply (Doc. 22) without leave of this Court. Given the content of the Sur-reply, the Court will treat it as Plaintiff's substantive response to the summary judgment motion and will rule on that motion, as well as the Rule 56(d) request, in this opinion.

---

[1] The page numbers referenced in this opinion are those that appear in the header of each document.

**I.     Plaintiff's Rule 56(d) Request**

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order."

A Rule 56(d) affidavit must (1) identify the probable facts that are unavailable, (2) state why these facts cannot be presented without additional time, (3) identify past steps to obtain evidence of these facts, and (4) state how much additional time would allow for rebuttal of the adversary's argument for summary judgment. *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1110 (10th Cir. 2017). A Rule 56(d) affidavit "must state with specificity how the additional material will rebut the summary judgment motion." *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1264 (10th Cir. 2006) (internal quotation marks and alterations omitted). Additionally, a court "may not look beyond the affidavit in considering a Rule 56(d) request." *Cerveny*, 855 F.3d at 1110.

Plaintiff has submitted an affidavit in which he purports to have "personal knowledge of the fact that the Defendant has concealed vital evidence concerning this case that has not been released from their custody/possession." (Doc. 20 at 4 [Pl.'s Aff. at ¶ 2]). Yet, this affidavit falls far short of satisfying the elements required of a Rule 56(d) affidavit.

Plaintiff first avers that his coworker, John Kaykay, provided an incident report statement to their manager, John Watts ("Watts").[2] (*Id.* [Pl.'s Aff. at ¶ 3]). Other than stating that he has "personal knowledge of the information that was contained in the report," (*id.* [Pl.'s Aff. at ¶ 4]), Plaintiff makes no attempt to identify the probable facts that this report would show, what steps he

---

[2] Defendant argues it has no such incident report executed by Kaykay. (Doc. 21 at 3).

has taken to obtain evidence of these facts, and how the report would rebut DGS's summary judgment motion.

Plaintiff also avers that DGS Supervisor Sander Amando ("Amando") "provided an initial statement report, and then subsequently provided more additional statement reports for [sic] which contradicted previous reports including information and findings." (*Id*. at 5 [Pl.'s Aff. at ¶ 6]). Yet these reports have clearly not been "concealed"; indeed, they were all attached to Defendant's Motion to Dismiss. (*See* Doc. 19 at 56-57, 69).

Plaintiff submitted a second affidavit (Doc. 20 at 6; Doc. 22 at 8), presumably to bolster the first. This second affidavit is by Kaykay, and it states:

> I wrote a statement report on 03/03/2014 at the request of the station manager (Mr. John Watts) regarding the aircraft incident that happened on 03/03/2014 involving Mr. Edwin Oveh. A copy of my statement was handed to Mr. John Watts upon completion of my duties that morning.

(*Id*.). This one-paragraph affidavit does not cure the insufficiencies of the first affidavit. Kaykay's affidavit does not identify the probable facts that are unavailable, state why these facts cannot be presented without additional time, identify past steps to obtain evidence of these facts, or state how much additional time is needed for rebuttal of DGS's argument for summary judgment. *See Cerveny*, 855 F.3d at 1110. Because Plaintiff has failed to meet the elements required of a Rule 56(d) affidavit, his request for additional discovery is denied.

## II. Defendant's Motion for Summary Judgment

### A. Background

DGS is a company that provides aviation services for its parent company, Delta, as well as other airlines. Plaintiff was employed as a ramp agent with DGS at the Tulsa International Airport beginning on January 23, 2013.

3

Past Infractions

During the approximately fourteen months Plaintiff was employed by DGS, he was written up multiple times for job-related incidents. On March 9, 2013, Plaintiff was issued a Counseling Form because "[t]he ramp and bagroom failed to load a standby bag" onto a flight. (Doc. 19 at 45). This Counseling Form included a warning that failure to comply with baggage loading procedures would result in "further disciplinary action up to and including termination of employment." (*Id*.). Plaintiff received another Counseling Form in late June 2013 due to a baggage loading delay. Plaintiff refused to sign this second Counseling Form, instead writing "Not my fault" and "wrongly blamed." (*Id*. at 46).

Plaintiff was issued additional Counseling Forms on July 13, 2013, for driving a tug without a seat belt, and on July 25, 2013, for failing to complete a security form for an aircraft. (*Id*. at 47-48). On August 2, 2013, Plaintiff received a Warning Letter for failing to complete Pre-Operational Inspection (POI) forms. The Warning Letter stated that "[a]ny additional problems in this area, or any infraction of Company policy or failure to meet Company standards, may result in more serious discipline up to and including termination." (*Id*. at 49). Plaintiff refused to sign the letter and, instead, wrote the following explanation:

> The real issue was that equipment [was] moved from the ramp, so their [*sic*] is no way for one person to do the POI . . . Secondly their [*sic*] was no way one person can do it within that short time. So, no reason to sign this Sir!

(*Id*.).

After the Warning Letter, Plaintiff received two more Counseling Forms: one on November 3, 2013, for failing to complete POI forms, and another on November 20, 2013, for putting the wrong date on a security form. Both of these Counseling Forms included warnings

that further infractions "may result in more serious discipline up to and including termination." (Doc. 19 at 50-51).

The Frozen Pipe Incident

In late February 2014, Plaintiff signed up to "babysit" an aircraft by himself on the night of March 2. This was his first time taking this type of assignment. (*See* Doc. 1 at 8). Babysitting an aircraft involves ensuring that the plane receives heat throughout the night—either through a hook-up from the jet bridge or, if necessary, from a portable heat cart located on the tarmac. (Doc. 19 at 34 [Watts Aff. at ¶ 15]). Employees babysitting a plane must also flush the toilets and run the faucets periodically to prevent the aircraft's water lines from freezing. (*Id*).

On the night of the shift, Plaintiff was by himself with the aircraft from approximately 2:00 a.m. to around 4:00 a.m. (*Id*. at 34 [Watts Aff. at ¶ 16]). The outdoor temperature that night was 3 degrees with a wind chill of -11 degrees. (*Id*.). Before 6:00 a.m., the gate agent was notified that the water lines on the plane were frozen. (*Id*. [Watts Aff. at ¶ 17]). The frozen water lines caused a three-hour delay in the aircraft's departure.

John Watts, the DGS Station Manager at the Tulsa International Airport, initiated an investigation into the incident. As part of the investigation, Watts gathered written statements by other DGS employees. Plaintiff's co-worker, Miquel Smith, submitted the following statement:

> Monday March 3, 2014 Edwin [Oveh] stayed overnight with [the aircraft], @ 4 am Edwin came in OPS [Operations] stating he was cold because the Heat wasn't working on Gate B-11 to keep the Plane warm. So I went out about 4:15 to 4:30 to restart it, But the Heat was still cool, after about 20 mins. The crew came @ 5 am and that [is] when we learned the water was frozen. I ask[ed] Edwin then why he didn't use the portable Heat cart, he said it was to[o] cold.
>
> On Tuesday March 4, 2014, Sander [Amando] ask[ed] Edwin [Oveh] about the incident on Monday and why he didn't use the portable Heat cart and he smiled and said it was to[o] cold.

(*Id*. at 55).

DGS Supervisor Sander Amando submitted two written statements as part of the investigation. In his first statement, Amando wrote that he was the supervisor on duty when the plane in question arrived at the gate, that he hooked up the heater to the plane around 9 p.m., and that "[a]fter everything [was] secured[,] all ramp crew went home and only Edwin stayed back to watched [*sic*] the plane." (Doc. 22 at 5). Amando's second written statement included a description of a conversation he purportedly had with Plaintiff:

> I asked [Oveh] what happen[ed] to the [aircraft] the other night. He said the heat wasn't work[ing] right. I asked him why you [didn't] called sups [supervisors] or get the other heatcart. He said it's to[o] cold to come down.

(Doc. 19 at 57).

In speaking with Watts, Plaintiff denied telling Amando and Smith that the heat had gone out and that it had been too cold to connect the heat cart. (*Id*. at 36 [Watts Aff. at ¶ 22]). Plaintiff also told Watts twice (without being asked) that he did not fall asleep while babysitting the plane. (*Id*.). He submitted his own incident report asserting that "the heat never went out during [his] watch" and that he "was not told to flush the sink and run the toilets." (*Id*. at 58). However, during Watts's investigation, airport technicians found that the jet bridge was not providing heat to the aircraft. (*Id*. at 35 [Watts Aff. at ¶ 19], 53). The technicians subsequently tagged the jet bridge heating unit "out of use" until further inspection.[3]

At the end of the investigation, Watts decided to recommend that Plaintiff's employment be terminated based on this incident. As of March 7, 2014, DGS's Serious Incident Review Board ("SIRB") had voted to support the termination recommendation. (*Id*. at 62). The recommendation

---

[3] Plaintiff denies that the jet bridge unit was tagged out of use, calling it "a bloody lie." (Doc. 19 at 99 [Pl. Dep., p. 130]).

6

was officially approved on March 17, 2014, and Plaintiff's termination ("due to Company and Safety Violations") became effective on that date. (Doc. 19 at 65).

Plaintiff appealed the termination decision, which led to some additional inquiries by DGS's Corporate HR Department. (*Id*. at 120 [Richardson Aff. at ¶ 7]). As part of this process, Amando sent an email to Watts stating that Plaintiff had been given a list of phone numbers of people to call if something out of the ordinary happened while babysitting the aircraft. (*Id*. at 69). Amando also stated in the email that he had twice instructed Plaintiff that he would need to run the faucets and flush the toilets on the plane to help keep the water lines from freezing. (*Id*.). Watts forwarded Amando's email to HR, and HR ultimately upheld the termination decision. (*Id*. at 71, 120 [Richardson Aff. at ¶ 7]).

Plaintiff then filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) alleging discrimination based on race, color, and national origin. (Doc. 1 at 5). After receiving his Notice of Right to Sue (Doc. 1 at 3), Plaintiff filed his Complaint in this case on February 25, 2015. In his Complaint, Plaintiff asserts that his termination was "due to race, color (national origin – xenophobia towards specific individuals of colors – Black)." (Doc. 1 at 2). He alleges that he was terminated "based on false allegations of job performance" and that he "was not given proper instructions about [the] job assignment or description by supervisors." (*Id*.). He also notes that "supervisors were not reprimanded or terminated." (*Id*.).

**B.    Standards**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). "By its very terms, [the Rule 56] standard provides that the mere

existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48 (emphasis in original). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The courts thus determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court's role at the summary judgment stage is not to weigh the evidence or resolve any disputed issues in favor of the moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

### C. Discussion

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(A)(1). A plaintiff may prove a violation of Title VII "either by direct evidence of discrimination or by following the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973)." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, which requires that the plaintiff demonstrate that (1) he is a member of a protected class, (2) he suffered an adverse employment action, and (3) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Luster v. Vilsack*, 667 F.3d 1089, 1095 (10th Cir. 2011).

Because DGS has elected not to dispute that Plaintiff can establish his prima facie case, (Doc. 19 at 20), the Court will move to the next step of the *McDonnell Douglas* framework. The burden then shifts to DGS "to articulate legitimate, nondiscriminatory reasons for its employment decision." *Luster*, 667 F.3d at 1092. DGS's burden here "is one of production, not one of persuasion." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). DGS has satisfied this burden; its proffered reason for terminating Plaintiff is that his negligence while babysitting the aircraft on March 3 caused a significant departure delay—after multiple workplace incidents and warnings that another infraction could "result in more serious discipline up to and including termination." (*See* Doc. 19 at 21, 45-51, 53).

Once the employer articulates its nondiscriminatory justification for the adverse employment action, the burden then shifts back to the plaintiff to show that the employer's proffered justification is pretextual. *Luster*, 667 F.3d at 1092. "[I]f a plaintiff 'presents evidence that the defendant's proffered reason for the employment decision was pretextual—i.e., unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

"A plaintiff may show pretext 'by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons.'" *Luster*, 667 F.3d at 1092-93 (quoting *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)). In determining whether DGS's proffered reasons for its employment decision were pretextual, the Court must examine "the facts as they appear to the person making the decision to

terminate plaintiff." *Kendrick*, 220 F.3d at 1231. The relevant question "is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Rivera v. City & Cty. Of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004)).

In *Kendrick v. Penske Transportation Services, Inc.*, a discharged employee argued—similarly to Plaintiff in this case—that the reasons for his termination were false. 220 F.3d at 1230-31. The circuit court assumed, for purposes of the case, that the employee had established a genuine issue of fact as to whether he had engaged in the conduct cited by his employer. However, the Court emphasized that the undisputed evidence showed that the person who terminated the employee did so "based on his belief" that the employee had engaged in such conduct. *Id*. at 1231. "[A] mistaken belief," noted the court, "can be a legitimate reason for an employment decision and is not necessarily pretextual." *Id*. (quoting *E.E.O.C. v. Flasher, Co., Inc.*, 986 F.2d 1312, 1322 n.12) (alteration in original). In *Kendrick*, there was no evidence that the employer's investigation into the incident was a sham, nor was there evidence that the people leading the investigation and making the ultimate termination decision acted with a discriminatory motive. As a result, the circuit court found no genuine issue of material fact as to pretext and ultimately affirmed the district court's order granting summary judgment in favor of the employer. *Id*. at 1232, 1234.

Here, the facts as they appeared to Watts are based on the Counseling Forms and Warning Letter issued to Plaintiff after the previous job-related incidents, as well as the written statements by Smith and Amando suggesting that Plaintiff knowingly chose not to use the portable heat cart to keep the plane warm on the night of the frozen pipe incident. When HR Corporate inquired further into whether Plaintiff had been properly trained, Watts provided HR with an email by

10

Amando contending that he had instructed Plaintiff twice regarding the sink and toilet procedures. (Doc. 19 at 71).

Once again, Plaintiff responds to this evidence by calling Smith a "bloody liar" (*id*. at 95 [Pl. Dep., p. 126]) and arguing that only Amando's first written statement is credible, whereas his second statement and email are both "forged/fabricated." (Doc. 22 at 2). According to Plaintiff, this first statement proves that Amando "never gave any instruction(s) to the plaintiff as per what to do, nor did he furnish the plaintiff with any phone number(s)." (*Id*.). Even assuming, *arguendo*, that Amando's first statement supports that inference,[4] Watts still had Smith's statement suggesting that (1) Plaintiff knew the heat had gone out from the jet bridge, (2) Plaintiff knew there was another heat source for the aircraft (the portable heat cart), and (3) Plaintiff chose not to connect the heat cart because it was "too cold." Plaintiff's insistence that Smith is a "bloody liar" does not create a genuine dispute of material fact regarding whether Watts's decision to terminate Plaintiff was pretextual. Even assuming there is a genuine issue of fact regarding whether Plaintiff was instructed on how to babysit the aircraft, Plaintiff has submitted no evidence to support an inference that Watts's termination decision was not based on a *good faith belief* that Plaintiff was adequately trained and negligently caused the frozen pipe incident.

Plaintiff argues in his Sur-Reply that his badge records prove he was not sleeping during work hours. (Doc. 22 at 1). Plaintiff does not provide any guidance in interpreting the eight pages of records, but it appears to the Court that there was a gap in time between Plaintiff swiping his badge card at 2:35 a.m. and 4:23 a.m. on the morning of the frozen pipe incident. (Doc. 20 at 8). Thus, even construing the evidence in favor of Plaintiff, these records do not lend support to his

---

[4] In fact, Amando's first statement does not say whether he did or did not give Plaintiff instructions and/or phone numbers. (*See* Doc. 19 at 56).

11

claim that he did not fall asleep while babysitting the aircraft. More importantly, the Court finds it irrelevant whether or not Plaintiff fell asleep during his babysitting shift. Although Watts noted in an email to an HR employee that it was "[his] opinion that Edwin fell asleep onboard the [aircraft]," (Doc. 19 at 71), Watts's official recommendation for termination of Plaintiff's employment cited Plaintiff's previous infractions and his failure "to ensure the aircraft remained heated which resulted in the potable water lines in the aircraft freezing." (Doc. 19 at 64). In other words, DGS's articulated justification for terminating Plaintiff does not rely on him having fallen asleep.

Another avenue for showing pretext is by providing evidence that plaintiff "was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. In a letter attached to his Complaint and during his deposition, Plaintiff identified two "supervisors"—Sander Amando and Linda Carter—that he believes should have been disciplined as a result of the frozen pipe incident. (Doc. 1 at 9; Doc. 19 at 118 [Pl. Dep., p. 210]). He stated in his Complaint that "supervisors were not reprimanded or terminated as a result of accountability." (Doc. 1 at 2). Yet Plaintiff fails to show that Amando and Carter are similarly-situated employees. Not only does Plaintiff himself call Amando and Carter "supervisors," suggesting they held a higher position in the company than he did, DGS has submitted evidence that Amando and Carter held dissimilar positions (supervisor and administrative assistant, respectively) than Plaintiff held and had dissimilar duties than Plaintiff. (Doc. 19 at 38 [Watts Aff. at ¶ 30]). There is simply no evidence upon which a reasonable factfinder could rationally find DGS's proffered explanation unworthy of credence.

Because Plaintiff has failed to establish a genuine issue of material fact as to whether DGS's proffered reasons for terminating him were pretextual, Defendant's Motion for Summary

Judgment (Doc. 18) is **granted**. As discussed above, Plaintiff's request under Fed. R. Civ. P. 56(d) (Doc. 20) is **denied**. A separate judgment in favor of Defendant will be entered forthwith.

ORDERED this 30th day of January, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE